UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GREGORY DYNABURSKY, as an individual and on behalf of all others similarly situated,

            Plaintiff,

     vs.

ALLIEDBARTON SECURITY SERVICES, LP and ALLIEDBARTON SECURITY SERVICES, LLC; and DOES 1 through 50, inclusive;

            Defendants.

CASE NO. SACV 12-2210-JLS (RNBx)

**ORDER GRANTING PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT (Doc.
130) AND PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, COSTS,
AND AWARDS (Doc. 128)**

1

1       Before the Court are two unopposed Motions filed by Plaintiffs Gregory

Dynabursky, Mikhail Babeshkov, and Jose Aguirre.  The first motion seeks final approval

of the class action settlement, (Final Approval Mot., Doc. 130), and the second motion

seeks approval of the requested attorneys' fees, costs, and service award, (Fee Mot., Doc.

128).  Having reviewed the papers, held a fairness hearing, and taken the matter under

submission, the Court GRANTS the Motion for Final Approval of the Class Action

Settlement and GRANTS the Motion for Attorneys' Fees, Costs, and Service Award, with

certain modifications to the requested fees and award.

## I.    BACKGROUND

### A.    Procedural History

Defendants Alliedbarton Security Services, LP and Alliedbarton Security Services,

LLC employed Plaintiff Gregory Dynabursky as an hourly-paid nonexempt security guard

from October 2011 to March 2012.  (Compl. ¶ 7, Doc. 1.)  On December 21, 2012,

Dynabursky filed a class action wage and hour lawsuit against Defendants.  (*See* Compl.)

In the Complaint, Dynabursky alleged the following claims: (1) failure to provide meal

breaks, Cal. Lab. Code §§ 226.7, 512; (2) failure to provide rest breaks, Cal. Lab. Code

§ 226.7; (3) improper wage statements, Cal. Lab. Code § 226; and (4) violation of

California's unfair competition law, Cal. Bus. & Prof. Code § 17200, *et seq.*  (*Id.* ¶¶ 30-

54.)  On January 29, 2014, the Court certified the following classes and subclasses in the

*Dynabursky* action:

> Meal Break Subclass (a): All of Defendant's past and present California employees who worked more than 6 hours in any "on-duty meal break" work shift as a Security Officer from December 21, 2008 through the present.
>
> Meal Break Subclass (b): All of Defendant's past and present California employees who worked more than 6 hours in any "on-duty meal break" work shift as a Security Officer from December 21, 2008 through the present who received itemized wage statements.

2

Rest Break Class: All of Defendant's past and present California employees who worked 3.5 hours or more in any work shift as a Security Officer from December 21, 2008 through the present.

Rest Break Subclass: All of Defendant's past and present California employees who worked 3.5 hours or more in any work shift as a Security Officer from December 21, 2008 through the present who received itemized wage statements.

(Class Cert. Order, Doc. 71.)

Two similar actions were also filed against Defendants in California state court. On April 1, 2008, Plaintiff Mikhail Babeshkov filed a class action wage and hour lawsuit against Defendants in Los Angeles Superior Court. (*See* Babeshkov Compl., Hawkins Decl. Ex. A, Doc. 117.) On behalf of himself and all non-exempt employees employed by Defendants in California, Babeshkov alleged the following claims: (1) failure to pay all wages, including overtime premiums, Cal. Lab. Code §§ 201-03.510, 558, 1194; (2) failure to provide rest periods and meal periods, Cal. Lab. Code §§ 226.7, 512; (3) failure to timely pay all wages due at termination, Cal. Lab. Code §§ 201-03; and (4) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200, *et seq.* (Babeshkov Compl. ¶¶ 1, 40-67.) On August 4, 2014, Plaintiff Jose Aguirre filed an enforcement action for recovery of civil penalties under California's Private Attorneys General Act. (*See* Aguirre Compl., Hawkins Decl. Ex. B, Doc. 117.) On behalf of himself and all non-exempt employees employed by Alliedbarton Security Services, LP, Aguirre sought penalties for the following violations: (1) failure to provide rest breaks, Cal. Lab. Code § 226.7, (2) failure to provide meal breaks, Cal. Lab. Code §§ 226.7, 512, (3) failure to provide paid recovery periods, Cal. Lab. Code § 226.7, and (4) failure to authorize and permit compliant paid rest periods, Cal. Lab. Code § 1198. (Aguirre Compl. ¶¶ 23-43.)

Plaintiffs' Counsel asserted they conducted a thorough investigation into the facts of these actions. (Joint Stip. ¶ 4, Doc. 116.) Defendants produced wage and hour policies, timesheets, post orders, wage statements, personnel records, and other relevant documents related to class members' employment for Plaintiffs' Counsel's review. (*Id.*) Numerous

3

1 rounds of motion practice have taken place, including motions for class certification. (*Id.*)

2 Plaintiffs' Counsel conducted witness interviews of putative class members and took

3 depositions of Defendants' persons-most-knowledgable. (*Id.*) On January 9, 2015, the

4 parties participated in mediation, which resulted in this proposed settlement. (Joint Stip.

5 ¶ 5.) Through the mediation process, the parties agreed upon the material terms of a

6 proposed global settlement for all three actions. (*Id.* ¶¶ 5-6.)

7        On March 31, 2016, the Court preliminarily approved the proposed settlement and

8 approved the appointment of Rust Consulting as the settlement administrator in this action.

9 (Prelim. Approval Order, Doc. 121.) In light of this preliminary approval, the Court set a

10 final fairness hearing for August 12, 2016. (*Id.* at 21.) However, the Court's order

11 required the parties to make certain modifications to the proposed content of class notice.

12 (*Id.* at 19-20.) On April 13, 2016, the Court approved the form and content of the revised

13 class notice. (Order Approving Class Notice, Doc. 125.)

14

15        **B.**    **The Settlement**

16        The settlement provides for a non-reversionary gross settlement fund of $11

17 million. (*Id.* ¶ 11.) Plaintiffs' Counsel assert that Defendants' total potential liability for

18 the three actions at issue amounts to approximately $40 million. (*See* Lee Decl. ¶ 2, Doc.

19 115-1.) The settlement class is defined as: "All non-exempt hourly employees who were

20 employed by Defendants in California at any time from April 1, 2004 through January 9,

21 2015." (Joint Stip. ¶ 7.) The parties assert that this class definition expands the classes

22 and subclasses certified in the *Dynabursky* action such that it includes the claims and

23 employees in the *Babeshkov* and *Aguirre* actions. (Mem. at 7, Doc. 115.) The parties

24

25

26

27

28

4

1  believe that the proposed settlement class is comprised of approximately 43,893

2  individuals.[1]  (Joint Stip. ¶ 7.)

3        After deducting attorneys' fees, litigation costs, Plaintiffs' service payments, the

4  costs of administering the settlement fund, and a $37,500 payment to the California Labor

5  and Workforce Development Agency for PAGA penalties, the net settlement amount will

6  be used to provide settlement payments to each class member.  (*Id.* ¶ 12.)  Individual

7  settlement allocations will depend on each class members' length of employment with

8  Defendants and will be distributed on a *pro rata* basis.  (*Id.* ¶¶ 11, 14.)  Unless a class

9  member timely and properly opts out of the settlement, she will be entitled to her

10  individual settlement payment.  (*Id.* ¶¶ 15.)  If any settlement class members' check is not

11  cashed within 180 days, the amount of the un-cashed check along with the class member's

12  name will be delivered to the California Department of Industrial Relations' unclaimed

13  wages fund.  (*Id.* ¶ 43.)

14        In return for net settlement fund payments, Plaintiffs and settlement class members

15  fully release and discharge the Released Parties from the following:

16

17        [A]ny and all claims, debts, liabilities, demands, obligations, guarantees,
        costs, expenses, interest, attorneys' fees, damages, penalties, action[s] or
        causes of action under California state law which were raised or could have

18        been raised in the Actions during the Settlement Class Period of April 1,
        2004 through January 9, 2015 based on the facts alleged therein by Named

19        Plaintiffs against Defendants . . . .

20

21

22  _____

23        [1] The Joint Stipulation also provides the following: "If the actual class-size exceeds this
   estimation by more than 5% but less than 10%, the settlement amount shall be increased on a pro

24  rata basis up to a maximum of an additional 10% pro rata.  Should the excess be more than 10% in
   the aggregate, Plaintiff shall have the right to rescind the Settlement Agreement.  If more than 5%

25  but less than 10% of the class in Dynabursky, Babeshkov and Aguirre, in the aggregate opts out,
   the Settlement Amount shall be reduced on a pro rata basis up to a maximum of 10%.  If more

26  than 10% of the class opts out, Defendants have the right to rescind the Agreement."  (Joint Stip.

27  ¶ 7.)

28

                                    5

(*Id*. ¶ 45.)  The "Released Parties" include (a) all of Defendants' present and former parent companies, subsidiaries, related or affiliated companies, (b) Defendant's divisions, and (c) the shareholders, officers, directors, employees, agents, attorneys, insurers, and successors and assigns of these entities.  (*Id*. ¶ 44.)

The settlement provides that Class Counsel will request (1) a fee award of up to one-third of the settlement fund and (2) an award of costs up to $100,000.  (*Id*. ¶¶ 20-21.) To the extent the Court does not approve the amount of attorneys' fees and costs sought by Class Counsel, any amount disallowed by the Court will remain a part of the net settlement fund to be distributed *pro rata* to settlement class members.  (*Id*. ¶ 11.)  The settlement further provides that Plaintiffs may apply for service payments of up to $10,000 each.  (*Id*. ¶ 23.)  The settlement administrator will also be paid from the gross settlement fund for the reasonable costs of administering this settlement, which the Stipulation estimates will not exceed $219,000.  (*Id*. ¶ 24.)

### C.    <u>Notice and Response</u>

Notice was sent to class members pursuant to the method approved by the Court. The Notice adequately describes the litigation and the scope of the involved class.  (Class Notice, Holman Decl. Ex. A, Doc. 130-16.)  Additionally, the Notice explains (1) the amount and makeup of the Settlement Fund, (2) the plan of allocation, (3) that Plaintiff's Counsel and Plaintiff will apply for attorneys' fees, costs, and a service award, and (4) class members' options to participate, opt out, or object to the settlement.  (*Id*.)

On May 5, 2016, Rust Consulting received class information from Defendants. (Holman Decl. ¶ 7, Doc. 130-16.)  The class list contained data for 37,263 potential class members.  (*Id*.)  By using the U.S. Postal Service's National Change of Address Database, Rust processed and updated the provided mailing addresses.  (*Id*. ¶ 8.)  On May 13, 2016, Notices were mailed to 37,263 class members through First Class Mail.  (*Id*. ¶ 9.)  The Notice advised class members they could submit a request for exclusion or object by July

12, 2016.  (*Id*.)  6,572 Notices were returned as undeliverable.  (*Id*. ¶ 10.)  Rust performed address traces on these Notices, and Rust promptly re-mailed 4,311 Notices upon locating a more current address.  487 Notices were returned as undeliverable for a second time. (*Id*.)  103 Notices were also returned by the Post Office with forwarding addresses attached.  (*Id*. ¶ 11.)  Rust promptly re-mailed Notices to those class members through First Class mail.  (*Id*.)  In sum, Rust determined that 2,748 Notices were undeliverable because no forwarding addresses were made available, no new addresses could be found through skip traces, or no new addresses could be found when the Notice Packets were returned as undeliverable for a second time.  (*Id*. ¶ 11.)

Rust received fifteen timely requests for exclusion.  (*Id*. ¶ 12.)  Rust received one timely objection from Charles Craver, who asserts he "always received [his] breaks and lunches without incident" throughout his three-year employment with Defendants.  (*Id*. ¶ 13; Craver Obj., Holman Decl. Ex. B, Doc. 130-16.)  Rust also received one untimely objection from Maurice Sears, a former employee of Defendants.  (Pl. Response to Sears Obj., Doc. 133.)  On July 20, 2016, past the exclusion and objection deadline, counsel for Sears emailed parties' counsel and indicated Sears recently filed a class action lawsuit in California.  (*Id*. at 3; Lee Suppl. Decl. Ex. A, Doc. 133-1.)  Sears' counsel requested that Sears be excluded from the *Dynabursky* settlement, and they objected to the terms of this settlement because it does not cover the substantive claims alleged in Sears' action.  (*Id*.)  Although the exclusion deadline has passed, counsel in this action agreed to allow Sears to opt-out of this settlement.  (Pl. Response to Sears Obj. at 4.)

The Court's Preliminary Approval Order also directed Plaintiff to submit declarations from class members discussing their reactions to the proposed settlement. (Prelim. Approval Order at 16-17.)  Accordingly, Plaintiffs submitted declarations from seventeen class members reflecting positive reactions to the settlement.  (Docs. 130-6, 130-7, 130-8, 130-9, 130-10, 130-11, 130-12, 130-13, 130-14, 131, 132.)  The Court also notes that, pursuant to its Preliminary Approval Order, (Prelim. Approval Order at 20-21),

1  the parties provided notice of the settlement to relevant state and federal authorities in

2  compliance with the Class Action Fairness Act.  (Naftel Decl. ¶ 2, Ex. A, Doc. 130-15.)

3       Plaintiffs now move for final approval of the class action settlement, and they also

4  seek attorneys' fees of one-third the common fund, reimbursement of expenses totaling

5  $58,735.15, settlement administration costs of $165,000, and service awards of $10,000 to

6  each class representative.

7

8  **II.  CONDITIONAL CERTIFICATION OF THE CLASS**

9       In its Preliminary Approval Order, the Court discussed the propriety of conditional

10  class certification for the purposes of settlement.  (Prelim. Approval Order at 7-10.)  The

11  Court also discussed the adequacy of Plaintiffs as Class Representatives and Plaintiffs'

12  Counsel as Class Counsel.  (*Id.* at 8-10.)  The Court sees no reason to depart from its

13  previous conclusion regarding the existence of a proper settlement class, its appointment of

14  Plaintiffs as Class Representatives, or its appointment of Class Counsel.  The Court

15  therefore incorporates its class certification analysis from the Preliminary Approval Order

16  into the instant Order.

17       Accordingly, the Court GRANTS the Motion as to final approval of conditional

18  class certification for the purposes of settlement.

19

20  **III.  FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

21      **A.  Legal Standard**

22       Before approving a class-action settlement, Rule 23 of the Federal Rules of Civil

23  Procedure requires the Court to determine whether the proposed settlement is fair,

24  reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2).  "To determine whether a settlement

25  agreement meets these standards, a district court must consider a number of factors,

26  including:  [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely

27  duration of further litigation; [3] the risk of maintaining class action status throughout the

28

trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Staton*, 327 F.3d at 959 (internal citation and quotation marks omitted).[2] "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

In addition to these factors, where "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (internal citations and quotations omitted) (emphasis in original). Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Such signs include (1) "when counsel receive a disproportionate distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal citations and quotation marks omitted).

---

[2] Factor [7], the presence of a governmental participant, does not apply to this case.

**B.**    **Discussion**

The Court finds that the factors listed above favor final approval of the proposed settlement.

### 1.    Strength of Plaintiff's Case

The principal claims at issue involve Defendants' alleged failure to provide meal periods, rest periods, restitutionary wages, and itemized wage statements required under the California Labor Code.  While Plaintiffs are confident they would prevail on the merits of their claims, Defendants dispute the above claims and assert they have fully complied with the law.  (*See* Final Approval Mem. at 10, Doc. 130-1; Joint Stip. ¶ 3.)  In the *Dynabursky* action, Defendants filed motions for partial summary judgment and class decertification and were poised to raise several legal and factual challenges.  (Docs. 90, 101.)  However, in the midst of briefing, the parties filed a notice of settlement.  (Doc. 102.)  Plaintiffs contend that if the litigation were to continue, Defendants may prevail on these issues.  (Final Approval Mem. at 10.)  The Court finds that given these potential obstacles, this factor weighs in favor of granting final approval.

### 2.    Risk, Complexity, and Likely Duration of Further Litigation

Plaintiffs argue that continued litigation would become costly, time consuming, and uncertain.  (Final Approval Mem. at 10-11.)  Although Plaintiffs emphasize the meritorious nature of the class claims, they observe that continued litigation would result in uncertainty in terms of both outcome and duration.  (*Id*.)  Settlement eliminates the risks inherent in Defendants' motions for summary judgment and class decertification, trial, and subsequent appeals, and it may provide the last opportunity for class members to obtain relief.  This factor therefore weighs in favor of granting final approval.  *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("In

10

1 | most situations, unless the settlement is clearly inadequate, its acceptance and approval are

2 | preferable to lengthy and expensive litigation with uncertain results." (citation omitted)).

3 |

4 | ### 3.   Risk of Maintaining Class Certification

5 | This Court previously certified the *Dynabursky* action, (Doc. 71), and Defendants

6 | later filed a motion for class decertification, (Doc. 101).  Although the Court did not

7 | address this motion given the parties' notice of settlement, (Doc. 102), Defendants may

8 | again move to decertify the *Dynabursky* action if this settlement is not approved.  The risk

9 | of decertification should the action proceed favors final approval.

10 |

11 | ### 4.   Amount Offered in Settlement

12 | The Court finds that the amount offered in settlement is reasonable.  The proposed

13 | settlement provides for a gross settlement fund of $11 million, which is a substantial

14 | benefit to the class.  (Joint Stip. ¶ 11.)  No portion of the settlement fund will revert back

15 | to Defendants.  (*Id.*)  This amount represents approximately 27.5% of Defendants'

16 | maximum potential liability of $40 million, as calculated by Class Counsel.  (*See* Lee

17 | Decl. ¶ 2, Doc. 115-1.)  A "settlement amounting to only a fraction of the potential

18 | recovery does not per se render the settlement inadequate or unfair," *In re Mego Fin. Corp.*

19 | *Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (internal quotation marks and citation

20 | omitted), and this percentage is consistent with the recovery in other wage and hour class

21 | actions.  *See Greko v. Diesel U.S.A., Inc.*, No. 10-CV-02576 NC, 2013 WL 1789602, at *5

22 | (N.D. Cal. Apr. 26, 2013) (finding settlement amount of a wage and hour class action that

23 | constituted 24% of estimated damages to be reasonable and beneficial to the class); *Glass*

24 | *v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26,

25 | 2007), *aff'd*, 331 F. App'x 452 (9th Cir. 2009) (finding settlement of a wage and hour class

26 | action that constituted 25% to 35% of the claimed damages to be reasonable);

27 | *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 623-24 (N.D. Cal. 2014) (finding

28 |

1   settlement amount of a wage and hour class action that equaled between 9% and 27% of

2   the total potential liability to be fair, adequate and reasonable given the uncertainty of

3   continued litigation).  Accordingly, in considering the difficulties of potential recovery, the

4   Court finds that the amount offered in settlement weighs in favor of final approval.

5          The allocation of settlement funds also appears fair, adequate, and reasonable.

6   Individual settlement allocations are determined by each class member's length of

7   employment.  (Joint Stip. ¶¶ 11, 14.)  Accordingly, the plan provides each class member

8   with a *pro rata* share of the net settlement fund.  *See In re Oracle Sec. Litig*., No. C-90-

9   0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that

10  reimburses class members based on the extent of their injuries is generally reasonable.").

11  This weighs in favor of final approval.

12         Finally, the amount of the settlement also appears fair, adequate, and reasonable in

13  light of the claims released by Plaintiffs and settlement class members.  Each class

14  member will release "any and all claims . . . under California state law which were raised

15  or could have been raised in the Actions during the Settlement Class Period of April 1,

16  2004 through January 9, 2015 based on the facts alleged therein by Named Plaintiffs

17  against Defendants."[3]  (Joint Stip. ¶ 45.)  The scope of this release weighs in favor of final

18  approval.  *See Hesse v. Sprint Corp*., 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement

19  agreement may preclude a party from bringing a related claim in the future even though

20  the claim was not presented and might not have been presentable in the class action, but

21  only where the released claim is based on the identical factual predicate as that underlying

22  the claims in the settled class action." (internal quotation marks and citation omitted)).

23

24

25

26

27         [3] In addition to the released claims set forth above, the Named Plaintiffs additionally release all
       claims related to their employment with Defendants.  (Joint Stip. ¶ 47.)

28

### 5.   Stage of the Proceedings and Extent of Discovery Completed

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Discovery can be both formal and informal. *See Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011).  Here, Plaintiffs' Counsel received policy and procedure documents, time and pay records, scheduling documents, work orders, and sample client contracts.  (Hawkins Decl. ¶ 5, Doc. 117; Dente Decl. ¶ 7, Doc. 115-5; Richard Decl. ¶ 8, Doc. 115-4.)  Plaintiffs' Counsel reviewed and analyzed the provided documents to assess the strength and value of the claims at issue.  (Hawkins Decl. ¶¶ 5-9; Dente Decl. ¶¶ 7-11; Richard Decl. ¶¶ 7-12.)  Plaintiffs' Counsel also took the depositions of Defendants' persons-most-knowledgable, Defendants took Dynabursky's deposition.  (Lee Decl. ¶¶ 2-7; Hyun Decl. ¶¶ 2-3, Doc. 115-3; Choi Decl. ¶¶ 3-4, Doc. 115-2), and Plaintiffs' Counsel interviewed numerous putative class members regarding their claims.  (Lee Decl. ¶ 6; Hyun Decl. ¶ 3; Choi Decl. ¶ 3; Hawkins Decl. ¶ 5; Dente Decl. ¶ 7; Richard Decl. ¶ 8.)  Given these facts, the Court concludes that the parties possess sufficient information to make an informed settlement decision.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (finding plaintiffs had "sufficient information to make an informed decision about the [s]ettlement" where formal discovery had not been completed but class counsel had "conducted significant investigation, discovery and research, and presented the court with documentation supporting those services.").  Accordingly, this factor weighs in favor of granting final approval.

### 6.   Experience and Views of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted).  As discussed above, Class Counsel have experience serving as

1  plaintiffs' counsel in wage and hour actions, and they have endorsed the settlement as fair,

2  reasonable, and adequate.  (Choi Decl. ¶ 5; Hyun Decl. ¶ 4; Lee Decl. ¶¶ 2, 11.)  Thus, this

3  factor favors preliminary approval.

4

5                      **7.        Reaction of Class Members to Proposed Settlement**

6          As discussed above, Rust sent 37,263 Notice Packets to settlement class members

7  by first-class mail.  (Holman Decl. ¶ 7.)  Rust received fifteen timely requests from class

8  members seeking to opt out of the settlement, and Rust provides seventeen declarations

9  from class members reflecting positive reactions to the settlement.  (*Id*. ¶¶ 12; Docs. 130-6,

10  130-7, 130-8, 130-9, 130-10, 130-11, 130-12, 130-13, 130-14, 131, 132.)  Rust received

11  one objection from a class member, who asserts he "always received [his] breaks and

12  lunches without incident" throughout his employment.  (Craver Obj., Holman Decl. Ex.

13  B.)  This objection does not appear to contest the *underlying terms of the settlement*.

14  Finally, parties' counsel received one timely request for exclusion from Maurice Sears,

15  which counsel permitted despite its untimely submission.  (Pl. Response to Sears Obj. at

16  4.)  Sears appears to raise objections to the settlement in conjunction with his request for

17  exclusion, but individuals who have excluded themselves from the class "are not bound by

18  the Settlement Agreement, and thus, do not have standing to object to the Settlement

19  Agreement."  *Wixon v. Wyndham Resort Dev. Corp*., No. C 07-02361 JSW, 2011 WL

20  3443650, at *1 n.2 (N.D. Cal. Aug. 8, 2011) (citations omitted).

21          Given the positive reactions to the settlement, the absence of any objections, and a

22  minimal number of opt-outs, this factor weighs in favor of granting final approval.  *See In*

23  *re Omnivision*, 559 F. Supp. 2d at 1043 ("It is established that the absence of a large

24  number of objections to a proposed class action settlement raises a strong presumption that

25  the terms of a proposed class action settlement are favorable to the class members."

26  (quoting *Nat'l Rural Telecommc'ns Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 528-29

27  (C.D. Cal. 2004)).

28

**8.      Signs of Collusion**

The Court finds no signs, explicit or subtle, of collusion between the parties.  Under the settlement agreement, the Court is to determine the proportion of the gross settlement fund that will be awarded as attorneys' fees, and the Court will also determine whether the requested amounts of Plaintiff service awards are justified by the circumstances of this case.  Moreover, unawarded amounts will remain in the gross settlement fund for the benefit of the Class, and uncashed check amounts will be delivered to the California Department of Industrial Relations' unclaimed wages fund.  Accordingly, the Court finds that this factor weighs in favor of granting final approval.

**9.      Conclusion as to Final Approval of the Settlement**

Considering all of the factors together, the Court concludes that the settlement is fair, reasonable, and adequate.  Accordingly, the Court GRANTS Plaintiff's Motion for Final Approval of the Class Action Settlement.

**IV.     SETTLEMENT ADMINISTRATOR COSTS**

The settlement agreement provides that the chosen claims administrator will be provided reasonable payment for its services, and it anticipated costs of no more than $219,000.  (Joint Stip. ¶ 24.)  A Project Manager for Rust estimates that the total cost for the administration of the settlement, including fees incurred and future costs for completion of the administration, is estimated to be $165,000.  (Holman Decl. ¶ 15.) Plaintiffs request that the Court approve a payment of $165,000 to Rust.  (Final Approval Mem. at 14.)  However, Plaintiffs and Rust did not provide any time records or breakdown of estimated costs for the Court's review.

At the fairness hearing, Class Counsel represented that the $165,000 is a flat fee encompassing all settlement administration services, and that it was the product of a competitive bidding process where each bidder was evaluated based on quality and cost.

15

1   Based on Class Counsel's representations, and in light of the size of the class and the fact

2   that the requested fee is below the anticipated maximum, the Court concludes that the

3   requested fee is reasonable under the circumstances.  The Court therefore GRANTS the

4   Motion as to this payment.

5

6   **V.    <u>ATTORNEYS' FEES</u>**

7   Rule 23 permits a court to award "reasonable attorneys' fees . . . that are authorized

8   by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "[C]ourts have an

9   independent obligation to ensure that the award, like the settlement itself, is reasonable,

10   even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prods.*, 654

11   F.3d at 941.  In the Ninth Circuit, the benchmark for a fee award in common fund cases is

12   25% of the recovery obtained.  *See id.* at 942 ("Where a settlement produces a common

13   fund for the benefit of the entire class, . . . courts typically calculate 25% of the fund as the

14   'benchmark' for a reasonable fee award, providing adequate explanation in the record for

15   any 'special circumstances' justifying a departure.").  Courts must "justify any increase or

16   decrease from this amount based on circumstances in the record."  *Monterrubio v. Best*

17   *Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6) Mexican Workers v.*

18   *Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).  The Ninth Circuit has

19   identified a number of factors the Court may consider in assessing whether an award is

20   reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill

21   required and quality of work, and (4) the contingent nature of the fee and the financial

22   burden carried by the plaintiffs.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th

23   Cir. 2002).  Counsel's lodestar may also "provide a useful perspective on the

24   reasonableness of a given percentage award."  *Id.* at 1050.

25   Class Counsel seek an attorneys' fee award of $3,666,666.67, which amounts to

26   one-third of the Gross Settlement Fund.  (Final Approval Mem. at 12.)  For the following

27   reasons, the Court finds the requested award to be excessive and awards attorneys' fees of

28

1  28% of the common fund.

2

3       A.      <u>Results Achieved</u>

4           Class Counsel achieved a settlement that represents approximately 27.5% of the

5  maximum potential damages.  Plaintiffs assert that this recovery is "a substantial financial

6  result" on behalf of the settlement class.  (Fee Mem. at 23, Doc. 128.)  However, as noted

7  above, this percentage of recovery falls within the typical range of accepted wage and hour

8  class action settlements.  *See Greko*, 2013 WL 1789602, at *5 (finding settlement amount

9  of a wage and hour class action that constituted 24% of estimated damages to be

10 reasonable and beneficial to the class); *Glass*, 2007 WL 221862, at *4 (finding settlement

11 of a wage and hour class action that constituted 25% to 35% of the claimed damages to be

12 reasonable); *Bellinghausen*, 303 F.R.D. at 623-24 (finding settlement amount of a wage

13 and hour class action that equaled between 9% and 27% of the total potential liability to be

14 fair, adequate and reasonable given the uncertainty of continued litigation).

15          Plaintiffs also point to this Court's ruling in *Vandervort v. Balboa Capital Corp.*, 8

16 F. Supp. 3d 1200 (C.D. Cal. 2014), in which we granted a one-third fee award to class

17 counsel following final approval of the proposed class action settlement.  *Id*. at 1209-10.

18 However, central to the Court's ruling in *Vandervort* was the "unprecedented nature of the

19 class certified" prior to settlement.  *Id*. at 1209.  Specifically, counsel in *Vandervort*

20 "achieved certification of *the first federal TCPA class* covering recipients of faxes that

21 lacked compliant opt-out notices[.]"  *Id*. (emphasis added).  Plaintiffs characterize the

22 *Dynabursky* class as similarly "unprecedented," but they fail to adequately support this

23 assertion.  (Fee Mem. at 14.)  Plaintiffs simply argue that at the inception of these actions,

24 there was no controlling authority regarding class certification of meal and rest period

25 claims as to security guards.  (*Id*.)  However, the alleged lack of dispositive authority does

26 not suggest the class certification in *Dynabursky* was "*unprecedented*," as it clearly was in

27 *Vandervort*.  Thus, the circumstances of this litigation do not lead the Court to conclude

28

1  the result is "excellent" or exceptional such that it warrants an upward departure from the

2  benchmark.

3

4          **B.**      <u>**Risk of Litigation**</u>

5        Plaintiffs argue that Class Counsel took significant risks in proceeding with the case

6  given the lack of dispositive authority for certifying meal and rest break claims as to

7  security guards.  (Fee Mem. at 14-15.)  In support, Plaintiffs point to: (1) Defendants'

8  success in defeating class certification in another case based on the same claims in the San

9  Francisco Superior Court, (*id.* at 15); (2) this Court's decision to stay the ruling on class

10  certification pending the Ninth Circuit's decision in *Abdullah v. U.S. Sec. Assoc.'s, Inc.*,

11  731 F.3d 952 (9th Cir. 2013), (Fee Mem. at 15; Stay Order, Doc. 53); (3) the existence of

12  unfavorable relevant state law prior to class certification, (Fee Mem. at 15; *see also*

13  *Abdullah*, 731 F.3d at 962 n.15); and (4) Defendants' interlocutory appeal of this Court's

14  Order granting class certification, (Fee Mem. at 15; Lee Fee Decl. ¶ 2, Doc. 128-1.)

15  Similar considerations have justified an upward departure from the benchmark in other

16  cases.  *Cf. Vizcaino*, 290 F.3d at 1048 (finding case "extremely risky" when, among other

17  factors, plaintiffs lost twice in district court and there was an absence of supporting

18  precedent); *Vandervort*, 8 F. Supp. 3d at 1209 (justifying upward departure, in part, by

19  noting interlocutory appeal of class certification order).  Accordingly, this factor justifies

20  an upward departure from the 25% benchmark.

21

22          **C.**      <u>**Skill Required and Quality of Work**</u>

23        Plaintiffs set forth the skill and quality of work provided by Class Counsel in these

24  three actions.  Plaintiffs describe Class Counsel's efforts to (1) research and investigate

25  potential claims, (2) engage in extensive discovery, (3) participate in motions practice

26  related to demurrer, staying the action, certifying the proposed class, reconsidering the

27  Court's certification order, and petitioning for permission to appeal, (3) participate in

28

1   mediation, and (4) respond to class members' questions.  (Fee Mem. at 3-10.)  The

2   circumstances of these actions and of Class Counsel's work support a finding that this case

3   required exceptional skill.  As noted previously, Class Counsel had to litigate in the face of

4   changing law.  The Court stayed its ruling on class certification pending the Ninth

5   Circuit's decision in *Abdullah*, (Stay Order, Doc. 53), and key relevant state law changed

6   while Class Counsel was moving for class certification, (Notice of New Authority, Doc.

7   49; *see also Abdullah*, 731 F.3d at 962 n.15.)  Class Counsel also had to defeat an

8   interlocutory appeal of this Court's Order granting class certification.  (Fee Mem. at 15;

9   Lee Fee Decl. ¶ 2.)  The work undertaken by Class Counsel in this case was not a "garden-

10  variety wage and hour class action."  *Compare Monterrubio*, 291 F.R.D. at 457.

11  Accordingly, this factor justifies an upward departure from the 25% benchmark.

12

13          **D.      Contingent Nature of the Fee**

14          Counsel took this case on a contingent basis and invested over 3,119 hours

15  prosecuting and resolving the case.  (Fee Mem. at 19.)  Class Counsel have received no

16  compensation for their efforts during the course of litigation, and they undertook

17  representation despite a sizeable risk that the settlement class would not obtain recovery.

18  (Fee Mem. at 13-14.)  "Courts have long recognized that the attorneys' contingent risk is

19  an important factor in determining the fee award and may justify awarding a premium over

20  an attorney's normal hourly rates."  *Monterrubio*, 291 F.R.D. at 457 (citing *In re Wash.*

21  *Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)).  Standing alone

22  this factor does not justify an upward departure of the benchmark.  *See, e.g.*, *Clayton v.*

23  *Knight Transp.*, 1:11-cv-00735-SAB, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013)

24  (acknowledging that the contingent nature of the fee "is an important factor," but declining

25  to grant an upward departure where "the risks associated with this case are no greater than

26  that associated with any other wage and hour action and no extraordinary circumstances

27  exist that would support an increase from the 25% benchmark.").  However, for reasons

28

19

1  already stated previously, the risks associated with this case are greater than a typical wage

2  and hour action and extraordinary circumstances exist to support an increase from the 25%

3  benchmark.  Accordingly, this factor also justifies an upward departure from the 25%

4  benchmark.

5

6       **E.**       **Lodestar Cross-Check**

7       To determine the reasonableness of a fee award, courts may compare the requested

8  percentage-of-the-common-fund with the counsel's lodestar calculations.  *Vizcaino*, 290

9  F.3d at 1050-51.  Here, Class Counsel assert they will have spent 3,276 hours litigating

10 this action through final approval.  (Fee Mem. at 19.)  Counsel provide records of the time

11 spent on this case.  (*See* Choi Timesheets, Choi Fee Decl. Ex. A, Doc. 128-3; Hawkins

12 Firm Timesheets, Hawkins Fee Decl. Ex. 1, Doc. 128-4; Hyun Firm Timesheets, Hyun Fee

13 Decl. Ex. A, Doc. 128-2; Lee Timesheets, Lee Fee Decl. Ex. A, Doc. 128-1; Richard Fee

14 Decl. ¶ 28, Doc. 128-5; Robbins Timesheets, Robbins Fee Decl. Ex. 1, Doc. 128-6.)  To

15 varying degrees, counsel used rates between $125-250 for paralegals, $350 to $550 for

16 associates, $650 for senior associates, and $600 to $775 for partners.  (Choi Fee Decl.

17 ¶ 11; Hawkins Fee Decl. ¶ 23; Hyun Fee Decl. ¶ 7; Lee Fee Decl. ¶ 10; Richard Fee Decl.

18 ¶ 5; Robbins Fee Decl. ¶ 22.)  Using the above figures, as well as estimates for work to be

19 expended after filing the Fee Motion, Class Counsel calculated a collective lodestar of

20 $1,976,565.25.  (Fee Mem. at 19.)

21      The lodestar cross-check first requires the court to determine whether the hourly

22 rates sought by counsel are reasonable.  "[T]he district court must determine a reasonable

23 hourly rate considering the experience, skill, and reputation of the attorney requesting

24 fees."  *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  This

25 determination "is not made by reference to rates actually charged [by] the prevailing

26 party."  *Id.*  The fee applicant bears the burden of showing that "the requested rates are in

27 line with those prevailing in the community for similar services by lawyers of reasonably

28

1  comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d

2  973, 980 (9th Cir. 2008) (citation omitted).  "Affidavits of the plaintiff['s] attorney and

3  other attorneys regarding prevailing fees in the community, and rate determinations in

4  other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory

5  evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge*

6  *Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Courts may also "rely on its own familiarity

7  with the legal market." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  As a

8  general rule, the forum district represents the relevant legal community.  *See Gates v.*

9  *Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

10       The Court notes a variety of concerns with the proposed hourly rates.  First,

11  Plaintiffs and counsel provide unsupported and conclusory assertions that the proposed

12  rates are consistent with the prevailing hourly rates for attorneys and staff in the Central

13  District providing similar services, skills, and experience.  (*See* Fee Mem. at 20; Choi Fee

14  Decl. ¶ 11; Hawkins Fee Decl. ¶ 23; Hyun Fee Decl. ¶ 7; Lee Fee Decl. ¶ 10; Richard Fee

15  Decl. ¶ 5; Robbins Fee Decl. ¶ 22.)  The Court also notes discrepancies between the rates

16  requested by counsel.  For example, Diane Richard, a partner who has worked for

17  seventeen years as an attorney, seeks an hourly rate of $600 per hour.  (Richard Fee Decl.

18  ¶¶ 3, 5.)  However, counsel with the same or less experience seek hourly rates of $650-

19  $700.  (*See, e.g.*, Choi Fee Decl. ¶¶ 10-11; Hyun Fee Decl. ¶ 7.)  Counsel do not explain or

20  justify these differences.

21       The Court also notes its concern with counsel's use of block-billing.  (*See* Richard

22  Fee Decl. ¶ 28; Robbins Timesheets.)  The time entries submitted by some counsel are

23  "replete with examples where, because of block-billing, it is impossible to determine

24  whether the time requested for any one task was reasonable." *Banas v. Volcano Corp.*, 47

25  F. Supp. 3d 957, 967 (N.D. Cal. 2014).  "The usage of block billing is fundamentally

26  inconsistent with the lodestar method because it 'render[s] it virtually impossible to break

27  down hours,' leaving the court without the ability to accurately determine whether a

28

1   reasonable amount of time was spent by counsel on a discrete task." *Yeager v. Bowlin*, No.

2   CIV 2:08-102 WBS JFM, 2010 WL 1689225, at *1 (E.D. Cal. Apr. 26, 2010) (quoting *Bell*

3   *v. Vista Unified Sch. Dist.*, 82 Cal. App. 4th 672, 689 (2000)).  "An excessive amount of

4   block billing thereby forces the court to take a 'shot in the dark' and guess whether the

5   hours expended were reasonable, which is precisely the opposite of the methodical

6   calculations the lodestar method requires." *Id*. (citing *Hensley*, *v. Eckerhart*, 461 U.S. 424,

7   434 (1983)).

8         However, *even if* this Court were to accept Plaintiffs' maximum lodestar calculation

9   of $1,976,565.25, an award of one-third the settlement fund would reflect a significant

10  windfall to counsel.  "An upward adjustment of the lodestar is appropriate only in

11  extraordinary cases, such as when attorneys faced exceptional risks of not prevailing or not

12  recovering any fees." *Monterrubio*, 291 F.R.D. at 461-62 (emphasis added) (quoting

13  *Goldkorn v. County of San Bernardino*, EDCV 06-707-VAP OPX, 2012 WL 476279, at

14  *10 (C.D. Cal. Feb. 13, 2012)).  As explained above, although Class Counsel undeniably

15  faced risks, the facts of this case do not reflect the extraordinary or exceptional

16  circumstances warranting an upward adjustment of the lodestar to one-third of the

17  settlement fund.  An award of one-third of the common fund would amount to

18  $3,666,666.67, and an award of 28% of the common fund would amount to $3,080,000.

19  Plaintiffs' own lodestar calculation demonstrates that a 28% recovery in this action would

20  be more reasonable and better justified than the award requested by counsel.

21        In their Motion, Plaintiffs argue this case is similar to *Lee v. JPMorgan Chase &*

22  *Co.*, a wage and hour class action settlement before this Court where we approved

23  attorneys' fees of one-third the common fund.  (*See* Fee Mem. at 16; Lee Order, Case No.

24  8:13-cv-00511-JLS-JPRx, Doc. 95.)  However, the Court observes that in *Lee*, (a) unique

25  considerations imposed by non-uniform arbitration agreements, class waivers signed by

26  portions of the putative class, and a pending appeal, as well as (b) unique risks as to class

27  and collective action certification warranted an upward departure to one-third of the

28

settlement fund.  (Lee Order at 9-10, 14-18.)  Here, the Court concludes that a 28% recovery is sufficient to compensate Class Counsel for the unique risks and circumstances of this case.  *Cf. Vizcaino*, 290 F.3d at 1048, 1050 (upholding 28% fee award in "extremely risky" case where plaintiffs lost twice in district court and there was an absence of supporting precedent).

Accordingly, in light of the Court's consideration of the relevant factors set forth by the Ninth Circuit as well as the lodestar cross-check, the Court finds that an award of 28% is appropriate and reasonable in this action.  Accordingly, the Court awards attorneys' fees of 28% of the gross settlement fund, which amounts to $3,080,000.

## VI.   LITIGATION COSTS

Plaintiffs request that the Court approve the reimbursement of $58,735.15 in counsel's litigation expenses and costs.  (Fee Mem. at 23.)  The Court notes that counsel's request is less than the maximum allowable under the joint stipulation, which provides that counsel may request costs up to $100,000.  (Joint Stip. ¶ 21.)

"Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."  *In re Omnivision*, 559 F. Supp. 2d at 1048. Class Counsel have documented their expenses incurred in prosecuting and resolving this action, which include postage, filing fees, parking expenses, deposition costs, delivery costs, travel costs, expert fees, and mediation fees.  (Choi Fee Decl. Ex. B, Doc. 128-3; Hawkins Fee Decl. Ex. 2, Doc. 128-4; Lee Fee Decl. Ex. B, Doc. 128-1; Robbins Fee Decl. ¶ 25.)  The Court concludes that Class Counsel's expenses are reasonable and adequately documented.  Accordingly, the Court GRANTS the Motion as to Plaintiffs' request for $58,735.15 in litigation costs.

1  **VII.   SERVICE AWARD**

2          Plaintiffs each seek a service award of $10,000.  (Fee Mem. at 23-25.)  Service

3  awards are "discretionary . . . and are intended to compensate class representatives for

4  work done on behalf of the class, to make up for financial or reputational risk undertaken

5  in bringing the action, and, sometimes, to recognize their willingness to act as a private

6  attorney general."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009)

7  (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)).  "To [further]

8  assess whether an incentive payment is excessive, district courts balance 'the number of

9  named plaintiffs receiving incentive payments, the proportion of the payments relative to

10  the settlement amount, and the size of each payment.'"  *Monterrubio*, 291 F.R.D. at 462

11  (quoting *Staton*, 327 F.3d at 977).  Courts "must 'evaluate [such] awards individually' to

12  detect 'excessive payments to named class members' that may indicate 'the agreement was

13  reached through fraud or collusion.'"  *Id.* (quoting *Staton*, 327 F.3d at 975, 977).

14          Here, the class representatives have expended a varying degree of hours in pursuit

15  of their actions.  Aguirre estimates he spent over eighty hours litigating his action, (Aguirre

16  Decl. ¶ 6, Doc. 128-7), Babeshkov estimates he spent over 140 hours litigating his action,

17  (Babeshkov Decl. ¶ 7, Doc. 128-8), and Dynabursky estimates he spent over 40 hours

18  litigating his action, (Dynabursky Decl. ¶ 2, Doc. 128-9).  Plaintiffs all met and spoke with

19  Class Counsel on numerous occasions to discuss the facts of the case, provided

20  information and documents requested by counsel, and risked retaliation by their current

21  and future employers.  (Fee Mem. at 24.)  Plaintiffs' actions resulted in a settlement that, if

22  approved, will provide monetary relief to the settlement class.  Moreover, in the context of

23  employment class actions, incentive awards appropriately acknowledge the "reasonable

24  fears of workplace retaliation" experienced by named plaintiffs.  *See Campbell v. First*

25  *Inv'rs Corp.*, No. 11-CV-0548 BEN (WMC), 2012 WL 5373423, at *8 (S.D. Cal. Oct. 29,

26  2012).  The Court therefore finds that granting approval of a service award is reasonable

27  and appropriate under the circumstances.

28

1       However, the Court finds that the *amount* of the requested service award is

2 excessive.  Plaintiffs fail to cite any cases where named plaintiffs were awarded service

3 awards of $10,000 for performing *similar services* in a similar wage and hour class action.

4 Here, although "the overall recovery on behalf of the class is substantial, [it is] by no

5 means extraordinary."  *See Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, No. C 07-

6 00362 MHP, 2009 WL 3562871, at *5 (N.D. Cal. Oct. 27, 2009).  Moreover, Plaintiffs

7 assert that settlement class members will receive, on average, a settlement payment of

8 $189, with the highest payment amounting to only $1,253.  (Final Approval Mem. at 1.)

9 Courts have awarded incentive payments of $7,500 when individual claimants receive an

10 average award of at least $4,000 in a wage and hour class action settlement, *see Morales v.*

11 *Stevco, Inc.*, No. 1:09-cv-00704 AWI, 2012 WL 1790371, at *14, 16-19 (E.D. Cal. May

12 16, 2012), *report and recommendation adopted in relevant part*, No. CIV-F-09-0704 AWI,

13 2013 WL 1222058 (E.D. Cal. Mar. 25, 2013); *Alvarado v. Nederend*, No. 1:08-cv-01099

14 OWW DLB, 2011 WL 1883188, at *9-11 (E.D. Cal. May 17, 2011), and courts have

15 reduced incentive payments to $2,500 where wage and hour class members would each

16 receive, on average, only $65.79, *see Monterrubio*, 291 F.R.D. at 463.

17       The cases that Plaintiffs cite are inapposite.  (Fee Mem. at 25.)  In the cited cases,

18 Plaintiffs were provided service payments of $25,000 to $50,000 in part due to the

19 immense size of the common fund.  *See Van Vranken v. Atl. Richfield Co*., 901 F. Supp.

20 294, 296 (N.D. Cal. 1995) ($76 million common fund); *In re Dun & Bradstreet Credit*

21 *Servs. Customer Litig*., 130 F.R.D. 366, 371 (S.D. Ohio 1990) ($18 million common fund);

22 *Enterprise Energy Corp. v. Columbia Gas Transmission Corp*., 137 F.R.D. 240 (S.D. Ohio

23 1991) ($32 million cash common fund); *Glass v. UBS Fin. Servs., Inc*., No. C-06-4068

24 MMC, 2007 WL 221862, at *1 (N.D. Cal. Jan. 26, 2007) ($45 million common fund).  The

25 size of the common fund in this global settlement amounts to $11 million, which—while

26 substantial—is significantly less than the common funds at issue in the above cases.  The

27 remaining two cases cited by Plaintiffs fare no better.  (Fee Mem. at 25.)  In those cases,

28

the class representatives were awarded large service payments due to their hundreds of hours of service. *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 913-14 (S.D. Ohio 2001) (awarding a $50,000 service payment to the class representative out of a $5.25 million common fund because the representative spent approximately 800 hours working on this litigation); *Cook v. Niedert*, 142 F.3d 1004, 1009, 1016 (7th Cir. 1998) (awarding a $25,000 incentive award to the class representative out of a $13 million cash common fund because the representative "spent hundreds of hours with his attorneys[.]"). Here, the named plaintiffs did not spend hundreds of hours when pursuing these actions.

Upon weighing the services rendered, the risks undertaken, and the proportion of the requested award relative to the settlement amount and individual class payments, the Court finds a service award of $10,000 is excessive under the circumstances. However, the Court notes the varying degree of hours spent by the named plaintiffs in these actions. Accordingly, Dynabursky is awarded a service payment of $6,000, Aguirre is awarded a service payment of $7,000, and Babeshkov is awarded a service payment of $8,000.

## VIII.  CONCLUSION

The Court finds the settlement to be fair, adequate, and reasonable, and accordingly GRANTS final approval of the settlement. The Court also GRANTS Plaintiffs' motion for attorneys' fees, costs, and service payments, with certain modifications. The Court awards Class Counsel $58,735.15 in costs and $3,080,000 in attorneys' fees, based on an award of 28% of the gross settlement fund. The Court also awards a service payment of $6,000 to Dynabursky, $7,000 to Aguirre, and $8,000 to Babeshkov. Finally, the Court awards $165,000 in class administration services and expenses to Rust Consulting. Distribution of the settlement fund to claimants shall be made in accordance with the method outlined in the settlement.

1      Plaintiffs shall file a proposed judgment forthwith.

2

3

4    DATED:  August 15, 2016

5                                               JOSEPHINE L. STATON
                                          UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28